**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Lead Counsel for Plaintiff and the Class*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| OFIR SCHWEIGER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>ULTRA CLEAN HOLDINGS, INC., JAMES SCHOLHAMER, and SHERI SAVAGE,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 3:25-cv-02768-JSC<br><br>CLASS ACTION<br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL |

Lead Plaintiff Ergül İlaslan ("Lead Plaintiff") and additional named plaintiff Andrew Marchitto[1] ("Plaintiffs"), by and through their attorneys, individually and on behalf of all other persons similarly situated, allege the following based upon personal knowledge as to Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the

[1] Plaintiff has moved the Court for leave to add Mr. Marchitto as an additional representative plaintiff and his counsel at Levi & Korsinsky, LLP as additional counsel in this Amended Complaint. *See* ECF No. 46. Lead Plaintiff's inclusion of Mr. Marchitto in this pleading is contingent on the Court granting that motion.

investigation conducted by and through Plaintiffs' attorneys, including, among other things, reviewing the public documents, conference calls, wire and press releases and other announcements of defendants Ultra Clean Holdings, Inc., ("Ultra Clean" or "Company"), James Scholhamer ("Scholhamer"), and Sheri Savage ("Savage") (together, "Defendants"), Ultra Clean's United States Securities and Exchange Commission ("SEC") filings, analysts' reports and advisories about the Company, interviews with former employees of the Company, and information readily obtainable on the internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery

## I. NATURE OF THE ACTION

1. This is a federal securities class action brought on behalf of a class consisting of all persons and entities that purchased Ultra Clean common stock between May 6, 2024, and February 24, 2025, both dates inclusive ("Class Period"), against the Defendants, under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"). Excluded from the class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

2. On February 24, 2025, surprising investors, Defendants disclosed that Ultra Clean, "a developer and supplier of critical subsystems, components, parts, and ultra-high purity cleaning and analytical services primarily for the semiconductor industry," was experiencing some "unexpected softness" in China. This disclosure came after Defendants spent the previous three months touting the Company's growth in China—growth that was particularly material to investors in the context of relatively flat sales of Ultra Clean's products elsewhere. On this news, Ultra Clean's common stock price fell from a February 24, 2025, close of $36.06 to a February 25 2025, close of $25.90 on relatively high volume.

3. During the Class Period, Defendants misled investors about the temporary nature of increased demand from Ultra Clean's customers in China in the second and third quarters of 2024, describing it as a sustainable increase in revenue when they knew or recklessly disregarded that it simply reflected that Chinese customers were temporarily stockpiling Ultra Clean products, buying semiconductor chips and related parts from U.S. companies in advance of anticipated additional U.S. export controls. In the context of reporting increasing revenue from China, Defendants violated their Reg. S-K, Item 303 obligation to disclose known trends and uncertainties on the Company's operations by failing to disclose that Ultra Clean's increased demand from Chinese customers was due to stockpiling, and rendered their affirmative Class Period statements about the Company's growth in China materially misleading.

## II. JURISDICTION AND VENUE

4. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 8 240.10b-5).

5. This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

6. Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as a substantial part of the conduct complained of herein occurred and the Company conducts business in this District.

7. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III. PARTIES

8. Plaintiffs purchased Ultra Clean common stock at artificially inflated prices during the Class Period and were damaged upon the revelation of the Defendants' fraud.

9. Ultra Clean Holdings, Inc. is a Delaware corporation with its principal executive offices located at 26462 Corporate Avenue, Hayward, California 94545. During the Class Period, the Company's common stock traded on the NASDAQ Stock Market (the "NASDAQ") under the symbol "UCTT."

10. Defendant Scholhamer was a Director and the Chief Executive Officer ("CEO") of Ultra Clean at all relevant times. He resigned from the Company on March 4, 2025.

11. Defendant Savage was, at all relevant times, the Senior Vice President of Finance and Chief Financial Officer ("CFO") of Ultra Clean.

12. During the Class Period, Defendants Scholhamer and Savage certified periodic financial reports pursuant to Section 302 of the Sarbanes-Oxley Act of 2002 ("SOX") stating that they had reviewed the periodic report in question and:

> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3.Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4.The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
>> a.Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

> b.Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>
> c.Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> d.Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
>
> 5.The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> a.All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>
> b.Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

13. In addition, during the Class Period, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, Defendants Scholhamer and Savage certified that the Company's periodic reports filed with the SEC "fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934; and" further that "the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

14. Defendants Scholhamer and Savage are sometimes referred to herein as the "Individual Defendants." Ultra Clean together with the Individual Defendants are referred to herein as the "Defendants."

15. The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Ultra Clean's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants."

16. Ultra Clean is liable for the acts of the Individual Defendants, and its employees under the doctrine of *respondeat superior* and common law principles of agency as all the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

17. The scienter of the Individual Defendants, and other employees and agents of the Company are similarly imputed to Ultra Clean under *respondeat superior* and agency principles.

## IV. SUBSTANTIVE ALLEGATIONS

### A. Background

18. Semiconductors are a class of materials that falls somewhere on the continuum between conductor and insulator. Manufacturers process silicon and other materials into wafers, which are then lithographically printed with various functionalities. The wafer is then cut into the chips that make up semiconductor devices, enabling different machines to harness electricity for processing power. Semiconductors are used in many critical industries, including automotive,

wireless, and computation and data storage. Demand in the semiconductor industry is soaring, and a McKinsey analysis suggests that industry revenues will climb to $1 trillion by 2030.

19. Semiconductor capital equipment ("semicap") companies provide the equipment necessary to manufacture, test, and package semiconductors. Five major semiconductor capital equipment companies generate a large percentage of the industry's revenue: ASML, Applied Materials, LamResearch, KLA, and Tokyo Electron.

20. As a developer and supplier of subsystems, components, parts, and ultra-high purity cleaning and analytical services primarily for the semiconductor industry, Ultra Clean delivers products and services critical to semiconductor capital equipment companies..

21. The Company consists of segments: Products and Services. The Products segment, which is responsible for approximately 90% of the Company's revenue, primarily designs, engineers, and manufactures production tools, components and parts, and modules and subsystems for the semiconductor and display capital equipment markets. Products include chemical delivery modules, frame assemblies, gas delivery systems, fluid delivery systems, precision robotics, process modules as well as other high-level assemblies. The Services segment provides ultra-high purity parts cleaning, process tool part recoating, surface encapsulation and high sensitivity micro contamination analysis primarily for the semiconductor device makers and wafer fabrication equipment ("WFE") markets.

22. According to the Company's annual report for the fiscal year ended December 31, 2023, filed with the SEC on Form 10-K on March 6, 2024 ("2023 10-K"), the Ultra Clean's two largest revenue customers in fiscal years 2023, 2022 and 2021 were Applied Materials, Inc., an American supplier of equipment, services and software for the manufacture of semiconductor chips, and Lam Research Corporation, an American supplier of wafer-fabrication equipment and related services to the semiconductor industry. Together, these top two customers accounted for 57.4%, 62.7% and 64.0% of the Company's revenues for fiscal years 2023, 2022 and 2021, respectively. Ultra Clean is one of the key equipment providers to both Applied Materials and

LAM Research, supplying them with gas and fluid delivery systems, precision robotics and other subsystems. Ultra Clean also has customers who are original equipment manufacturers based in China, but those customers have consistently accounted for less than 10% of the Company's revenue.

**B. Revenue From Chinese Customers As A Percentage of Ultra Clean's Total Revenues Increased Materially as Revenues Were Otherwise Flat**

23. Revenues from Chinese customers was material to Ultra Clean, and particularly so because it represented an area of potential growth relative to others in which the Company's sales remained flat. As a percentage of the Company's total, revenue from China had increased slightly year over year since 2021, contributing 5.5% in fiscal 2022 and 6.8% in fiscal 2023. In the 2023 10-K, Defendants disclosed:

> The Company's principal markets include America, Asia Pacific and EMEA. The Company's foreign operations are conducted primarily through its subsidiaries in China, Malaysia, Singapore, Israel, Taiwan, South Korea, United Kingdom and the Czech Republic. Revenues by geographic area are categorized based on the customer's location to which the products were shipped or services were performed. The following table sets forth revenue by geographic area (in millions):

| | Year Ended 12/29/2023 | Year Ended 12/30/2022 | Year ended 12/31/2021 |
|---|---|---|---|
| Singapore | $608.7 | $898.9 | $778.5 |
| United States | $526.8 | $738 | $734.4 |
| Australia | $124.9 | $117.2 | $98.5 |
| China | $118.1 | $131.4 | $99.9 |
| South Korea | $94.2 | $151.4 | $152.7 |
| Taiwan | $71.3 | $97.2 | $88.1 |
| Malaysia | $21.8 | $50.4 | $34.1 |
| Israel | $18.1 | $19.2 | $22.3 |
| Others | $150.6 | $170.6 | $93.1 |
| Total | $1,734.5 | $2,374.3 | $2,101.6 |

24. In the first three months of 2024, however, revenue from Chinese customers surged materially relative to total revenue. In Ultra Clean's Quarterly Report on Form 10-Q for the period ended March 29, 2024, filed with the SEC on May 6, 2024, Defendants disclosed revenue by geographic region as follows, showing that in 1Q revenue from China a percentage of total revenue, year-over-year, had increased from 5.3% in 2023 to 11.49% in 2024.

| | Three months ended 3/29/24 | Three months ended 3/31/23 |
|---|---|---|
| Singapore | $157.3 | $152.3 |
| United States | $141.0 | $133.8 |
| China | $54.9 | $23.1 |
| Australia | $37.5 | $30.5 |
| South Korea | $23.6 | $27.4 |
| Taiwan | $15.5 | $18.9 |
| Malaysia | $7.2 | $2.7 |
| Israel | $4.3 | $5.1 |
| Others | $36.4 | $39.5 |
| Total | $477.7 | $433.3 |

25. Indeed, as 2024 progressed, contributions to total revenue showed material increases from the same quarter in 2023. In Ultra Clean's Quarterly Report on Form 10-Q for the period ended June 28, 2024, filed with the SEC on July 26, 2024, Defendants again separated revenue by geographic region, disclosing that revenue from China had increased in 2Q as percentage of total revenue, year-over-year, from 7.3% in 2023 to 11.5% in 2024.

| | Three months ended 6/28/24 | Three months ended 6/30/23 |
|---|---|---|
| Singapore | $168.9 | $138.9 |
| United States | $146.2 | $134.1 |
| China | $59.6 | $30.9 |
| Australia | $45.2 | $31.3 |
| South Korea | $24.7 | $22.7 |
| Taiwan | $21.6 | $21.6 |
| Malaysia | $7.2 | $2.7 |
| Others | $49.9 | $42.0 |
| Total | $516.1 | $421.5 |

26. Without disclosing any reason for the material increase in revenues from China, in their July 25, 2024, press release disclosing 2Q 2024 results, Defendant Scholhamer stated, "UCT executed well in Q2 due to ***ongoing strength in demand from the domestic China market*** and customers supplying High Bandwidth Memory and equipment supporting advanced packaging for AI applications." Defendants Scholhamer concluded, "UCT's broad portfolio and strategic footprint are supporting our customers' technology roadmaps in 2024 and will enable us to accelerate growth as the market strengthens."

27. This trend continued in the third quarter of 2024. In Ultra Clean's Quarterly Report on Form 10-Q for the period ended September 27, 2024, filed with the SEC on October 30, 2024, Defendants again separated revenue by geographic region, disclosing that revenue from China had increased in 3Q as percentage of total revenue, year-over-year, from 6.1% in 2023 to 10.3% in 2024.

| | Three months ended 9/27/24 | Three months ended 9/29/23 |
|---|---|---|
| Singapore | $173.9 | $155.4 |
| United States | $145.6 | $125.8 |
| China | $56.7 | $26.7 |
| Australia | $48.9 | $33.1 |
| South Korea | $25.3 | $21.9 |
| Taiwan | $23.2 | $220.0 |
| Others | $66.8 | $52.1 |
| Total | $549.4 | $435.0 |

28. Again, without disclosing the reasons for the revenue bump in China, Defendants in their October 28, 2024, press release for 3Q 2024, Defendant Scholhamer stated, "UCT's third quarter results came in above expectations driven by broader equipment demand for AI infrastructure build out and sustained domestic China market spending." Defendants Scholhamer concluded, "[t]he rationale for significant long-term investment in WFE remains strong. UCT's

vertical integration capabilities and strategic manufacturing network provide a competitive edge, and should enable us to increase share as demand expands."

29. The charts above demonstrate that China was the only market in which Ultra Clean's revenues were growing substantially immediately before the during the Class Period. As a result, the reason for the growth was material to investors.

30. Indeed, as one example, on May 7, 2024, Needham & Company raised its price target for Ultra Clean stock to $56 from $50 based on "steady results with upside from HBM and China OEMs". The report went on to specifically note that sales in China contributed to Ultra Clean's upside in the first quarter of 2024, and while it only made up a small portion of the Company's overall revenue, it management "fore[saw] sustainability in China OEM revenue for the rest of the year."

### C. In Anticipation of U.S. Export Controls, Chinese OEM Stockpile Ultra Clean Products, Increasing Materially Revenues From China

31. Ultra Clean's customers and operations in China expose the Company to impact from U.S. trade policies concerning China. For example, in the 2023 10-K, Defendants warned:

> ***Growing uncertainties with U.S. trade policies and export regulations with regard to China have adversely impacted and could continue to adversely impact us.***
>
> We and our customers have significant operations in China. The extent of the impact of the ongoing trade tension between the United States and China on our sales and operations is difficult to predict. In October 2022, the U.S. Department of Commerce imposed additional license requirements on certain semiconductor goods and technologies sold in China. This expansion of export license requirements in China has adversely impacted some of our customers with business presence in China, which in turn had an adverse impact on our business. These new regulations may create uncertainty for our operations in China, as the full scope and extent of the new license requirements remain unknown, and may change over time. Obtaining these export licenses may be difficult for us and/or our customers, and any delays (or denial) in the approval process could disrupt our supply chains and negatively impact production schedules. For example, the utilization rate of our manufacturing subsidiary in China may be negatively

impacted if we would not be able to support our customers with goods and services originating out of that location.

32. With respect to export controls, among other things, the October 2022 regulations that Ultra Clean's 2023 10-K referenced added certain advanced and high-performance computing chips and computer commodities that contain such chips to the Commerce Control List, added new license requirements for items destined for a supercomputer or semiconductor development or production end use in China, expanded the scope of the Export Administration Regulations (EAR) over certain foreign-produced advanced computing items and foreign produced items for supercomputer end uses, expanded the scope of foreign-produced items subject to license requirements to twenty-eight existing entities on the U.S. Entity List for China,[2] added certain semiconductor manufacturing equipment and related items to the Commerce Control List, added new license requirements for items destined to a semiconductor fabrication "facility" in China that fabricates integrated circuits meeting specified thresholds, restricted the ability of U.S. persons to support the development, or production, of integrated circuits at certain China-located semiconductor fabrication "facilities" without a license, added new license requirements to export items to develop or produce semiconductor manufacturing equipment and related items, and established a Temporary General License to minimize the short-term impact on the semiconductor supply chain by allowing specific, limited manufacturing activities related to items destined for use outside of China.

33. The October 2022 regulations went into effect immediately, without notice and comment, likely because of concern that by identifying its plans in advance, the U.S. would have triggered stockpiling.

[2] The Entity List identifies entities for which there is reasonable cause to believe, based on specific and articulable facts, that the entities have been involved, are involved, or pose a significant risk of being or becoming involved in activities contrary to the national security or foreign policy interests of the United States.

34. On October 17, 2023, the Department of Commerce issued updates to the October 2022 export controls. Among other things, the updates increased the geographic scope of the chip controls to cover additional countries as well as some corporate subsidiaries located anywhere in the world to limit the reach of Chinese multinational companies and mitigate the risk of diversion of controlled chips through third countries.

35. While the October 2022 regulations had been announced suddenly, by 2024, the semiconductor chip industry understood that more export controls would continue to come, and in response to these anticipated additional export control regulations, Chinese companies that purchase semiconductor chips and parts from the U.S., including Ultra Clean's customers, began to stockpile supplies.

36. On February 26, 2024, *The Wall Street Journal* ("*WSJ*") reported that Chinese chip makers were rushing to stockpile equipment in anticipation of tougher Western export restrictions. *WSJ* noted that the stockpiling binge could dent subsequent sales growth, concluding that "For Western and Japanese chip-equipment makers, export restrictions to China are both a blessing and a curse. For now, they are raking in huge sales. But long-term risks are multiplying, especially at the lower end of the technological spectrum."[3]

37. On August 23, 2024, Semafor reported that Chinese firms were importing record levels of chip making equipment, stockpiling the equipment and building out semiconductor supply chains to guard against further US curbs.[4]

---

[3] Jacky Wong, *China Is Stockpiling for Next Phase of the Chip Wars, The Wall Street Journal*, Feb. 26, 2024.

[4] Prashant Rao and Mathias Hammer, *Chinese firms import record levels of chip making equipment,* Semafor, Aug. 23, 2024 (available at https://www.semafor.com/article/08/23/2024/chinese-firms-import-record-levels-of-chip-making-equipment).

38. On September 27, 2024, CNBC also reported that companies in China had increased spending on semiconductor equipment since the U.S. introduced tighter export restrictions in October 2022, amid concerns that more regulations were coming.[5]

39. This industry-wide stockpiling trend included a temporary surge in demand for Ultra Clean's products in China.

40. When the U.S. Department of Commerce announced new export control regulations on December 2, 2024, however, it appeared that their impact on Ultra Clean's sales to China would be minimal. Among other new rules, the December 2, 2024, regulations expanded the Foreign Direct Product Rule's application to semiconductor manufacturing equipment. The Foreign Direct Product Rule places controls on the transfer of certain items made abroad with the benefit of U.S. technologies, allowing the Department of Commerce to regulate the reexport and transfer of foreign-made items if their production involves certain technology, software or equipment that the Department of Commerce designates as subject to the Export Administration Regulations. But the expansion covered only equipment, not subsystems sold to China, unless the buyer was on the Entity List. As a result, UltraClean could continue to sell subsystems to customers in China.

41. Former Employee 1 ("FE1"), a high-level member of Ultra Clean's C-suite from April 2019 through December 31, 2023, maintained deep connection with his staff who remained with the Company throughout 2024. FE1 reported that his former employees told him that this surge in demand lasted for two to three months between the second and third quarters of 2024.

---

[5] Anniek Bao, *China's ambitions for semiconductor self-sufficiency thwarted by lack of chipmaking tools,* CNBC (Sept. 27, 2024) (available at https://www.cnbc.com/2024/09/27/chinas-ambitions-for-chip-self-sufficiency-thwarted-by-lack-of-tools-.html#).

42. FE1 explained that as the Company's customers in China completed their stockpile purchasing and it became clear that Ultra Clean would be able to continue to sell subsystems to them, the surge in demand abated. Ultra Clean was able to maintain the appearance of increased revenue for one addition quarter, however—the fourth quarter of 2024—by pulling forward revenue from orders that it would ship in the first quarter of 2025.[6] According to the Company's 2023 10-K, Ultra Clean recognizes revenue when promised goods or services (performance obligations) are transferred to a customer in an amount that reflects the consideration to which the Company expects to be entitled in exchange for those goods or services, typically at shipment or delivery. As a result, this pulling forward was not consistent with the Company's publicly stated revenue recognition practices.

43. Former Employee 2 ("FE2"), who worked at Ultra Clean just under the C-suite level during the Class Period, confirmed FE1's statement that Ultra Clean moved orders that were set to be delivered in the first or second quarter of 2025 into the fourth quarter of 2024. According to FE2, the Company's current chief operating officer, Harjinder Bajwa, decided to deliver the Company's orders from Applied Materials that were due to be delivered in the first half of 2025 in the fourth quarter of 2024. This enabled Ultra Clean to meet its revenue forecast for the fourth quarter of 2024.

44. Ultra Clean intimidated other employees who worked at the Company during the Class Period and acquired relevant knowledge out of providing information. One employee who worked directly on demand planning stated that the Company is "vicious" and comes after former employees. Others insisted that their titles and dates of employment not be used in connection with any information they might offer.

---

[6] According to the Company's 2023 10-K, Ultra Clean recognizes revenue when promised goods or services (performance obligations) are transferred to a customer in an amount that reflects the consideration to which the Company expects to be entitled in exchange for those goods or services, typically at shipment or delivery. As a result, this pulling forward was not consistent with the Company's publicly stated revenue recognition practices.

45. Defendants never disclosed that increased demand from Chinese customers during the second and third quarters of 2024 was temporary, due to this industry-wide stockpiling trend.

46. More, despite media coverage of stockpiling by Chinese companies in the semiconductor industry, it was undisclosed that Ultra Clean's growth in China was occurring for the same reason. Initiating coverage on September 24, 2024 with an outperform rating and a price target of $70 per share, Oppenheimer & Co. noted that Ultra Clean's components and services were fungible and unlikely to be restricted, adding extra resilience. In other words, there was not the same widely understood need for Chinese semiconductor companies to stockpile Ultra Clean's products as those of other companies in the industry. In an October 29, 2024 report, Craig-Hallum Capital Group LLC positively described the Company's "continued strength in China."

## V. DEFENDANTS VIOLATED THEIR AFFIRMATIVE OBLIGATION TO DISCLOSE MATERIAL RISKS AND UNCERTAINTIES UNDER SEC REGULATIONS

47. Registrants are obligated to "provide, under the caption 'Risk Factors,' a discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. §229.105. The presentation of risks that could apply generically to any registrant or any offering is discouraged. *Id*. Where a summary of risk factors is required, the issuer should provide "a series of concise, bulleted or numbered statements that is no more than two pages summarizing the principal factors that make an investment in the registrant or offering speculative or risky." *Id*.

48. The Reg. S-K, Item 303, also requires a registrant to discusses in the "Management's Discussion and Analysis of financial condition and results of operations" material information relevant to an assessment of the financial condition and results of operations of the registrant including an evaluation of the amounts and certainty of cash flows from operations and from outside sources. 17 C.F.R. § 229.303. The discussion and analysis must focus specifically on material events and uncertainties known to management that are reasonably likely

to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition. *Id*. This includes descriptions and amounts of matters that have had a material impact on reported operations, as well as matters that are reasonably likely based on management's assessment to have a material impact on future operations. *Id*. The discussion and analysis must be of the financial statements and other statistical data that the registrant believes will enhance a reader's understanding of the registrant's financial condition, cash flows and other changes in financial condition and results of operations. *Id*. A discussion and analysis that meets the requirements of this paragraph is expected to better allow investors to view the registrant from management's perspective. *Id.*

49. In a 1989 Interpretive Release, the SEC described the purposes of MD&A:

> The Commission has long recognized the need for a narrative explanation of the financial statements, because a numerical presentation and brief accompanying footnotes alone may be insufficient for an investor to judge the quality of earnings and the likelihood that past performance is indicative of future performance. MD&A is intended to give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future.

*Management's Discussion & Analysis of Fin. Condition & Results of Operations; Certain Inv. Co. Disclosures*, Release No. 6835 (May 18, 1989) (the "1989 Interpretive Release") available at 1989 WL 1092885.[7]

50. Item 303 creates a duty to disclose a known trend, event or uncertainty unless management determines that a material effect on financial condition or results of operations is not likely to appear. The 1989 Interpretive Release provides the following test to determine if disclosure under Item 303(a) or Part I, Item 5 of Form 20-F is required:

[7] The 1989 Interpretive Guidance applies to Item 5(d) of Form 20-F. Form 20-F, Instruction 5 (stating that issuers should refer to the 1989 Interpretive Guidance); 2003 Guidance, at 2003 WL 22996757, *1 n.1 (same).

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:
>
> (1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required. (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results is not reasonably likely to occur.

1989 Interpretive Release, 1989 WL 1092885, at *6.

51. Issuers must disclose regulatory actual or contemplated regulatory action, as shown by an example provided by the 1989 Interpretive Release:

> Facts: A registrant has been correctly designated a PRP by the EPA with respect to cleanup of hazardous waste at three sites. No statutory defenses are available. The registrant is in the process of preliminary investigations of the sites to determine the nature of its potential liability and the amount of remedial costs necessary to clean up the sites. Other PRPs also have been designated, but the ability to obtain contribution is unclear, as is the extent of insurance coverage, if any. Management is unable to determine that a material effect on future financial condition or results of operations is not reasonably likely to occur.
>
> Based upon the facts of this hypothetical case, MD&A disclosure of the effects of the PRP status, quantified to the extent reasonably practicable, would be required. [Footnote omitted]. For MD&A purposes, aggregate potential cleanup costs must be considered in light of the joint and several liability to which a PRP is subject. Facts regarding whether insurance coverage may be contested, and whether and to what extent potential sources of contribution or indemnification constitute reliable sources of recovery may be factored into the determination of whether a material future effect is not reasonably likely to occur.

*Id.* at *6.

52. Issuers must disclose both (a) known trends and uncertainties and (b) any potential material impact of known trends and uncertainties on their own operations even if the trends are a matter of public knowledge. 1989 Interpretive Release, 1989 WL 1092885 at *6.

53. Defendants knew that stockpiling by Chinese customers of semiconductor chips and parts from the U.S. was a major trend in Ultra Clean's sales all through 2024, even though the Company was known to be resilient to export controls. In the context of Defendants' affirmative disclosures about the increase in revenues from China and its impact on the Company's total revenues, Defendants failed to disclose the trend and its impact on the Company's revenue growth from customers in China. Instead, each time analysts asked about their expectations about the Company's revenues from China, they downplayed the impact of stockpiling and told them that they expected the growth to continue. These material omissions and misstatements violated their affirmative obligations to disclose known trends and uncertainties on Ultra Clean's operations.

## VI. FALSE AND MISLEADING STATEMENTS AND OMISSIONS

54. On May 6, 2024, Ultra Clean published its results for the first quarter of 2024, reporting $477.7 in revenues for the quarter ended March 29, 2024. While Ultra Clean disclosed in its financial report filed on Form 10-Q ("1Q2024 10-Q") that together, Applied Materials and Lam Research accounted for 54.1% of its revenues during the quarter, it also emphasized the growth of the Company's revenues from its customers in China.

55. The 1Q2024 10-Q included a section for Management's Discussion And Analysis of Financial Condition And Results Of Operations ("MD&A"). This discussion did not disclose that Ultra Clean's increased revenues from customers in China were due to stockpiling in advance of expected new export control measures.

56. During the associated earnings call, also held on May 6, 2024, CEO Scholhamer stated:

> We reported a solid first quarter on the top and bottom lines. The increase in orders above midpoint was driven by ongoing strength in the domestic China market and High Bandwidth Memory and advanced packaging demand supporting AI.

> Earnings came in above our guided range due to higher volume, favorable mix and our ongoing focus on site efficiencies.
>
> ***Elevated domestic China demand underscores the importance that the Chinese government and chip industry has placed on becoming self-sufficient.*** Chinese chip companies are rapidly investing in new semiconductor factories to advance their nation's capabilities and address export controls imposed by the U.S. and its allies.

[Emphasis added].

57. Then, during the question-and-answer segment of the earnings call, CEO Scholhamer responded to an analyst from Needham & Company, in relevant part:

> Yu Shi – Needham & Company, LLC – Senior Analyst: Jim, Sheri, congrats on the solid results and very strong guidance. I think, Jim, in your prepared remarks, I got the sense that your strength in Q1 seems to be primarily due to some of the upside you see with your Chinese OEM customers, and I did notice that in your PowerPoint that the category called other OEM, meaning outside of Lam and Applied, seems to have seen the most amount of growth.
>
> But it gets a little bit hard for me to reconcile, because China revenue has been like a single-digit of percent of your total revenue. So how do I think about your actual exposure to the Chinese OEMs at this point?
>
> James P. Scholhamer – CEO: Yes, Charles. Yes, you're right. ***The Chinese revenue is -- directly to the OEMs, is relatively small, but it's actually doubled, I think, over the last 2 or 3 quarters and then nearly doubled again.*** So -- and if you think about our overdrive on revenue, I mean that was about half of it. The other half was on deposition tools that are used in the AI applications.

[Emphasis added].

58. The foregoing statements touting a positive trend in the Company's growth in its revenues from customers in China were materially false and misleading. Defendants knew or recklessly disregarded at the time that Defendants issued the 1Q2024 10-Q and held the earnings call that Ultra Clean's increased revenues from customers in China were due to stockpiling in advance of the expected new export control measures. In violation of their Item 303 duty to disclose known trends and uncertainties, Defendants failed to include in their 1Q2024 10-Q

MD&A that the Company's demand surge was due to a temporary stockpiling trend. When Defendants touted elevated domestic demand in China, they rendered themselves duty-bound to disclose that the demand was driven by this temporary surge that would not last past the announcement of new export regulations, either because Ultra Clean's sales to customers in China would be curtailed or because they would not be and stockpiling would no longer be necessary.

59. On July 25, 2024, Ultra Clean published its financial results for the second quarter of 2024, reporting $516.1 in revenues for the quarter ended June 28, 2024.

60. The Company continue to tout its revenue growth in China. In the July 25, 2024, press release announcing Ultra Clean's results, Defendant Scholhamer stated, ""UCT executed well in Q2 ***due to ongoing strength in demand from the domestic China market*** and customers supplying High Bandwidth Memory and equipment supporting advanced packaging for AI applications[.]" [Emphasis added].

61. Ultra Clean's financial report filed on Form 10-Q ("2Q2024 10-Q") included an MD&A section, which did not disclose that Ultra Clean's increased revenues from customers in China were due to stockpiling in advance of expected new export control measures.

62. During the associated earnings call, also held on July 25, 2024, Defendant Scholhamer further emphasized the Company's revenue growth in China, noting that "[w]e saw strength in both Products and Services across all geographies ***and in particular, elevated equipment spending within the domestic China market[.]"*** [Emphasis added].

63. Also during the earnings call, Defendant Savage did the same, stating that "total company-wide revenue was up quarter-over-quarter across all geographies and major customers, ***most notably in the domestic China market***." [Emphasis added].

64. Later during the call, Yu Shi of Needham & Company, LLC asked the Individual Defendants how they expected Ultra Clean's direct business to China to trend, and specifically if they were seeing consistent, half-over-half growth, or the potential for leveling off or decline. Defendant Scholhamer explicitly dismissed the clear concern that the growth might be due simply

to a temporary stockpiling surge, responding that "we expect this high level of business to continue in China through the rest of the year . . . . But we do not see it really tailing off. But I don't think that's the whole story. We're also seeing strength in other parts of our diversified business that's really helping us kind of move forward. So when you think about detractors or what might degrade, we're not looking at that. I think we're looking at things pretty much staying how they are, and we're looking more at a potential upside to certain areas as we go forward."

65. The foregoing statements touting a sustainable, continuing positive trend in the Company's growth in its revenues from customers in China were materially false and misleading. Defendants knew or recklessly disregarded at the time that Defendants issued their press release and 2Q2024 10-Q and held the earnings call that Ultra Clean's increased revenues from customers in China were due to stockpiling in advance of the expected new export control measures and were not, contrary to his statements, sustainable. In violation of their Item 303 duty to disclose known trends and uncertainties, Defendants failed to include in their 2Q2024 10-Q MD&A that the Company's demand surge was due to a temporary stockpiling trend. When Defendants touted elevated domestic demand in China, they rendered themselves duty-bound to disclose that the demand was driven by this temporary surge that would not last past the announcement of new export regulations, either because Ultra Clean's sales to customers in China would be curtailed or because they would not be and stockpiling would no longer be necessary.

66. On October 28, 2024, Ultra Clean published its financial results for the third quarter of 2024, reporting $540.4 in revenues for the quarter ended September 27, 2024. It also published outlook for the fourth quarter of 2024, forecasting that its China revenues would keep growing as the local manufacturing continued to ramp. The Company stated in its press release that it expected revenue for the fourth quarter of 2024 in the range of $535 million to $585 million.

67. Ultra Clean's financial report filed on Form 10-Q ("3Q2024 10-Q") included an MD&A section, which did not disclose that Ultra Clean's increased revenues from customers in China were due to stockpiling in advance of expected new export control measures.

68. During the associated earnings call, held on the same day, Defendant Scholhamer again touted the Company's revenues from China, emphasizing their sustainability into 2025:

> Turning to China. Revenue from our Shanghai manufacturing facility supporting local Chinese OEMs remained elevated. Recent conversations with local customers and our expectation that regional fabs will continue to expand and new ones will come online, supported by local government investments, leads us to believe that this will - higher level of spend will continue into 2025. We will continue to meet regularly with our local Chinese customers and watch for any change in sentiment or spending patterns that could alter our opinion.
>
> * * *
>
> This has been continued strength. And I just actually met with the CEOs in China, and they continue to think that that's going to stay strong through the year and through the next year as well.
>
> * * *
>
> We have 2 main customers there [in China], and 1 is dealing with some internal issues and quality and it's not our issue. Another 1 is growing faster. So we had - it is lumpiness, but it's nothing to be concerned about the long-term prospects.

69. The foregoing statements touting a sustainable, continuing positive trend in the Company's growth in its revenues from customers in China were materially false and misleading. Defendants knew or recklessly disregarded at the time that Defendants issued their press release and 3Q2024 10-Q and held the earnings call that Ultra Clean's increased revenues from customers in China were due to stockpiling in advance of the expected new export control measures and were not, in his words, due to "continued strength." In violation of their Item 303 duty to disclose known trends and uncertainties, Defendants failed to include in their 3Q2024 10-Q MD&A that the Company's demand surge was due to a temporary stockpiling trend. When Defendants touted elevated domestic demand in China, they rendered themselves duty-bound to disclose that the demand was driven by this temporary surge that would not last past the announcement of new

export regulations, either because Ultra Clean's sales to customers in China would be curtailed or because they would not be and stockpiling would no longer be necessary.

70. On December 2, 2024, the U.S. Department of Commerce announced new export control regulations, which effectively left open a loophole for Ultra Clean's sales in China by covering only equipment, not subsystems.

## VII. THE TRUTH EMERGES

71. On February 24, 2025, Ultra Clean published fourth quarter and full year 2024 results, reporting $563.3 million in revenues for the quarter ended December 27, 2024.

72. The Company also published outlook for the first quarter of 2025, stating in its press release that it expected revenue in the range of $505 million to $555 million for the coming quarter, GAAP diluted net income (loss) per share to be between $(0.11) and $0.09, and non-GAAP diluted net income per share to be between $0.22 and $0.42.

73. On its earnings call that day, the Individual Defendants admitted that the Company was experiencing some "unexpected softness" in China. Christopher Cook, the president of the Products division, and Defendant Savage attempted to explain this in colloquy with Yu Shi of Needham & Company, LLC as follows:

> Yu Shi – Needham & Company, LLC – Senior Analyst: I think so far, I heard the 3 -- probably 3 dependent issues related to China for China business. One, a little bit customer specific. It seems like one customer has some qualification ramp issues. Two, you also mentioned that there seems to be some softening of the China demand. But three, I think you said that there is a little bit of inventory excess that your Chinese customers are carrying right now. But the third one, I'm not exactly surprised because you guys were pretty transparent last year by saying you thought that some of the customers may be doing a little bit of stockpiling. But can you kind of rank order, I mean, among the top 3, which one are the ones that are causing most of the near-term air pockets? And really just want to understand relative to, let's say, a quarter ago, what has changed?

Christopher S. Cook. – President of Products Business: Yes. So in -- by the way, thank you, Charles. This is Chris Cook. And I would rank those in order as you described them, actually, the customer-specific ramp issue that we expect to be resolved in the second quarter was a hit, followed by a blend of the inventory and demand corrections that we see. Obviously, to the extent that our customers burn through that local inventory that shows up in reduced demand for us and excess inventory burn. So it's a combination of those 3 in that order.

Yu Shi – Needham & Company, LLC – Senior Analyst: Got it. So let's say, if we take out that China for China business, what would the guidance be like, I mean, for the ex China business from Q4 into Q1? Do you still see sequential growth? Or what's the picture there?

Christopher S. Cook. – President of Products Business: No. I would say we're not growing sequentially. We're off. And as we expect those things to be resolved, we do expect for recovery in the second half, but we'll continue to see softness through the first half of the year.

Yu Shi – Needham & Company, LLC – Senior Analyst: No. Chris, I meant the ex China business, the non-China business, I was trying to ask, yes, from Q4 to Q1. What's embedded in your guidance? Are you -- sequential growth?

Christopher S. Cook. – President of Products Business: Yes, sorry, I misunderstood the question. Yes, we're flattish.

Yu Shi – Needham & Company, LLC – Senior Analyst: Okay. Maybe last one for me. The gross margin for Q4 and seems like the implied gross margin guidance in Q1. Obviously, you don't really guide gross margin. I heard you talk about product versus service mix seems like a little bit lighter than you thought. But the product gross margin alone looks like a little bit lighter as well. What's the reason for that, the gross margin -- the weakness in the Products division?

Sheri L. Savage – CFO & Senior VP of Finance: Yes, really, the key thing is the mix of the products that got shipped and where they got shipped from. So obviously, with China being a little bit lower, we started to see that in Q4, and that's a high-margin business. We also saw some of our other higher-margin products be a little bit lighter for the quarter. So also being at year-end, we did have some additional expenses surrounding just truing up some of our inventory and things like that. So that's what really affected it. We see it somewhat flat going into Q1. And we will continue to be looking at our cost structure with a close eye and make sure that we continue to help that as we move through the year as well.

74. On this news, the value of Ultra Clean's stock sharply declined. From a closing market price of $36.06 per share on February 24, 2025, Ultra Clean's stock price fell to $25.90 per share on February 25, 2025, a decline of over 28% in a single day, on unusually high trading volume.

75. Several analysts who had been following Ultra Clean lowered their price targets in response to Ultra Clean's disclosures. For example, Oppenheimer, while lowering their price target from $70 to $60, noted weakness in China and headwinds in Services from a struggling IDM customer. Craig Hallum lowered their price target for Ultra Clean from $60 to $44, noting slower than expected customer ramps in China, as well as softer end market demand and excess inventory levels in the region following a strong 2024.

76. On March 5, 2025, Ultra Clean announced the immediate resignation of Defendant Scholhamer. The Company stated he would be replaced temporarily by Clarence Granger, Chairman of the Board of Directors and Ultra Clean's founding CEO, until the Board hired a permanent replacement.

## VIII. INSIDER TRADING

77. The trading activities of the Individual Defendants indicate their respective motives to achieve personal financial benefits by the sales of stock at artificially inflated prices, while making false and misleading statements and withholding material adverse facts from the market.

78. On February 11, 2025, Ultra Clean filed an Amendment No. 1 to its quarterly report on Form 10-Q for the fiscal quarter ended March 29, 2024 ("1Q2024 10Q-A"), which it had originally filed with the SEC on May 6, 2024. The 1Q2024 10Q-A disclosed Rule 10b5-1 trading arrangements entered into by the Individual Defendants on March 8, 2024—shortly before the beginning of the Class Period.

79. Defendant Scholhamer's Rule 10b5-1 trading plan provided for the sale from time to time of up to 90,268 shares of the Company's common stock, subject to certain minimum price thresholds. Defendant Scholhamer's trading plan was scheduled to terminate on March 7, 2025, subject to early termination.

80. Defendant Savage's Rule 10b5-1 trading plan provided for the sale from time to time of, subject to certain minimum price thresholds: (i) up to 41,125 shares of the Company's common stock held outright; and (ii) the additional sale of (net) shares of the Company's common stock received upon the vesting, if any, of 22,111 (gross) shares of the Company's common stock upon satisfaction of applicable service based and/or performance based vesting criteria, of restricted stock units and performance stock units, after giving effect to tax withholdings. Defendant Savage's trading plan was scheduled to terminate on August 29, 2025, subject to early termination.

81. On June 7, 2024, Defendant Savage made five sales of Ultra Clean common stock: 1,044 shares at a weighted average price of $45.8882 per share, 5,551 shares at a weighted average price of $45.9109 per share, 1,467 shares at a weighted average price of $45.91 per share, 1,706 shares at a weighted average price of $46.0052 per share, and 5,551 shares at a weighted average price of $46.1405 per share. These sales were not made pursuant to Defendant Savage's Rule 10b5-1 trading plan dated March 8, 2024.

82. On June 10, 2024, Defendant Savage sold 2,708 shares of Ultra Clean common stock at a price of $47.18 per share. This sale was not made pursuant to Defendant Savage's Rule 10b5-1 trading plan dated March 8, 2024.

83. On July 2, 2024, Defendant Savage sold 9,682 shares of Ultra Clean common stock at a price of $51.08 per share, pursuant to her Rule 10b5-1 trading plan dated March 8, 2024.

84. On July 8, 2024, Defendant Savage sold 10,079 shares of Ultra Clean common stock at a price of $54.18 per share, pursuant to her Rule 10b5-1 trading plan dated March 8, 2024.

85. On July 11, 2024, Defendant Savage sold 897 shares of Ultra Clean common stock at a price of $55.87 per share, pursuant to her Rule 10b5-1 trading plan dated March 8, 2024.

86. On July 12, 2024, Defendant Savage sold 2,440 shares of Ultra Clean common stock at a price of $55.87 per share, pursuant to her Rule 10b5-1 trading plan dated March 8, 2024.

87. On July 9, 2024, Defendant Scholhamer sold 26,608 shares of Ultra Clean common stock at a price of $55.10 per share, pursuant to his Rule 10b5-1 trading plan dated March, 2024.

88. Knowing that Ultra Clean's customers in China were engaging in stockpiling of its products in anticipation of more export controls by the U.S. and its allies, the Individual Defendants failed to disclose this known, material trend and instead misled investors that the Company's increased revenue in China was actually based on sustainable, long-term growth. They then sold material amounts of Company stock while it was artificially inflated, including through Rule 10b5-1 plans that were based on certain price thresholds. These sales establish an inference of scienter.

## IX. CLASS ACTION ALLEGATIONS

89. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased Ultra Clean publicly traded common stock during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal

representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

90. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Ultra Clean's stock actively traded on NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are at least hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Ultra Clean or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

91. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

92. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

93. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Ultra Clean; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

94. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) CLASS ACTION ALLEGATIONS

95. The market for Ultra Clean securities was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose described herein, Ultra Clean securities traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities, relying upon the integrity of the market price of Ultra Clean securities and the market information relating to Ultra Clean, and have been damaged thereby.

96. During the Class Period, the artificial inflation of Ultra Clean stock was caused by the material misrepresentations and/or omissions particularized in this Amended Complaint, causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Ultra Clean's business and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Ultra Clean and its business and financial condition, causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing Ultra Clean common stock at such artificially inflated prices, and each of them has been damaged as a result.

97. At all relevant times, the market for Ultra Clean securities was an efficient market for the following reasons, among others:

(a) Ultra Clean stock met the requirements for listing, and was listed and actively traded on NASDAQ;

(b) As a regulated issuer, Ultra Clean filed periodic public reports with the SEC;

(c) Ultra Clean regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Ultra Clean was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

98. As a result of the foregoing, the market for Ultra Clean securities promptly digested current information regarding Ultra Clean from all publicly available sources and reflected such information in Ultra Clean stock price. Under these circumstances, all purchasers of Ultra Clean securities during the Class Period suffered similar injury through their purchase of Ultra Clean securities at artificially inflated prices, and a presumption of reliance applies.

## XI. NO SAFE HARBOR

99. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint.

The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## XII. COUNTS

### COUNT I
### For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Against All Defendants

100. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

101. This Count is asserted against each of the Defendants, and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

102. During the Class Period, each of the Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

103. Each of the Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a) employed devices, schemes, and artifices to defraud;

(b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Ultra Clean common stock during the Class Period.

104. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly reports, SEC filings, press releases, and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Ultra Clean securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Ultra Clean's business and operations.

105. By virtue of their positions at Ultra Clean, the Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, the Individual Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Individual Defendants. Said acts and omissions of the Individual Defendants were committed willfully or with reckless disregard for the truth. In addition, each of these Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

106. Information showing that the Individual Defendants acted knowingly or with reckless disregard for the truth is peculiarly within these Defendants' knowledge and control. As senior managers and/or directors of Ultra Clean, the Individual Defendants had knowledge of the details of Ultra Clean's internal affairs.

107. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of

Ultra Clean. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Ultra Clean's businesses, operations, future financial condition, and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Ultra Clean securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Ultra Clean's business which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Ultra Clean common stock at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

108. During the Class Period, Ultra Clean securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Ultra Clean securities at prices artificially inflated by the wrongful conduct of Defendants. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that they paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Ultra Clean securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Ultra Clean securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

109. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

110. As a direct and proximate result of the wrongful conduct of Defendants, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock during the Class Period.

**COUNT II**
**For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants**

111. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein,

112. During the Class Period, the Individual Defendants participated in the operation and management of Ultra Clean, and conducted and participated, directly and indirectly, in the conduct of Ultra Clean's business affairs. Because of their senior positions, they knew the adverse non-public information about Ultra Clean's current and future business prospects.

113. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Ultra Clean's business practices, and to correct promptly any public statements issued by Ultra Clean which had become materially false or misleading.

114. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Ultra Clean disseminated in the marketplace during the Class Period concerning the Company's business operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Ultra Clean to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Ultra Clean within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Ultra Clean securities.

115. Each of the Individual Defendants, therefore, acted as a controlling person of Ultra Clean. By reason of their senior management positions and/or being directors of Ultra Clean, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Ultra Clean to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Ultra Clean and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

116. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Ultra Clean.

## XIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Lead Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## XIV. DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: August 26, 2025

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**
*/s/ Jacob A. Goldberg*
Jacob A. Goldberg (admitted *pro hac vice*)
Leah Heifetz-Li (admitted *pro hac vice*)
101 Greenwood Avenue, Suite 440
Jenkintown, PA 19046
Telephone: (215) 600-2817
Facsimile: (212) 202-3827
Email: jgoldberg@rosenlegal.com
lheifetz@rosenlegal.com

Laurence M. Rosen (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Lead Counsel for Lead Plaintiff and the Class*

**LEVI & KORSINSKY, LLP**

*/s/ Adam M. Apton*
Adam M. Apton (SBN 316506)
1160 Battery Street East, Suite 100
San Francisco, CA 94111
Tel: (415) 373-1671
aapton@zlk.com

Additional Counsel for Plaintiffs and the Class

**CERTIFICATE OF SERVICE**

I, Jacob A. Goldberg, hereby certify that a true and correct duplicate copy of the foregoing Amended Complaint was filed electronically on August 26, 2025. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ Jacob A. Goldberg
Jacob A. Goldberg